J-A16017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FREDERICK MACOSKY AND SHARON MACOSKY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MALLIKARJUN UDOSHI, M.D.; | : | |
| M.S.U.R. M.D. ASSOCIATES, P.C., | : | |
| WILKES-BARRE HOSPITAL COMPANY, | : | |
| LLC D/B/A WILKES-BARRE GENERAL | : | |
| HOSPITAL, AND WILKES-BARRE | : | No. 1682 MDA 2018 |
| GENERAL HOSPITAL HEART AND | : | |
| VASCULAR INSTITUTE | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WILKES-BARRE | : | |
| HOSPITAL COMPANY, LLC D/B/A | : | |
| WILKES-BARRE GENERAL HOSPITAL | : | |

Appeal from the Judgment Entered September 13, 2018
In the Court of Common Pleas of Luzerne County Civil Division
at No(s):  2016-1881

BEFORE:   LAZARUS, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY MURRAY, J.:                              **FILED JULY 19, 2019**

Wilkes-Barre  Hospital  Company,  LLC,  D/B/A  Wilkes-Barre  General

Hospital (Appellant), appeals from the judgment[1] entered in favor of Frederick

Macosky and Sharon Macosky (collectively, Macosky) following a jury trial in

this medical malpractice action.  Upon review, we affirm.

---

[1] Appellant purported to appeal from the September 13, 2018 order granting Macosky's motion to mold the verdict.  However, the appeal properly lies from the judgment that was entered that same day, and we have amended the caption accordingly.

Macosky filed a complaint on March 1, 2016, raising claims of negligence, vicarious liability, corporate negligence, and loss of consortium against, variously, four defendants: Appellant; its employee cardiologist Mallikarjun Udoshi, M.D. (now deceased);[2] Dr. Udoshi's practice group, M.S.U.R. M.D. Associates, P.C.; and the Wilkes-Barre General Hospital Heart and Vascular Institute (HVI).

Macosky averred that on January 9, 2014, Frederick Macosky, then age 47, underwent a stress echocardiogram (EKG) at HVI "for screening due to a family history of coronary artery disease." Macosky's Amended Complaint, 2/22/17, at ¶ 7. The EKG result was "abnormal" and showed a low ventricular ejection fraction of 45.6%. *See id.* at ¶ 14; Exercise Stress Echocardiogram Report, Macosky Trial Exhibit 2. Nevertheless, Appellant or Dr. Udoshi reported to "Macosky's primary care physician that the overall impression of the stress [EKG] was normal except for poor patient physical conditioning." Macosky Amended Complaint, 2/22/17, at ¶ 10.

Approximately two years later, in December 2015, Macosky presented to Appellant's emergency room with shortness of breath and other symptoms. An EKG taken on December 29, 2015 showed "profound abnormalities including [worsened] left ventricular dysfunction with ejection fraction of 10-

---

[2] Dr. Udoshi passed away after the commencement of the action, and his estate was substituted as a party. *See* Appellant's Brief at 9 n.1.

15%." *Id.* at ¶ 13. Macosky was diagnosed with non-ischemic cardiomyopathy, underwent cardiac catherization, and was "placed on a wearable defibrillator 'Life Vest.'" *Id.* Macosky's complaint alleged that the defendants' negligence caused an increased risk of harm of progression and worsening of his cardiac condition.

Prior to trial, Macosky settled his claims against Dr. Udoshi. Accordingly, the vicarious liability claims were removed. Trial Court Opinion, 12/11/18, at 1. The case proceeded to a jury trial on February 26, 2018, on the sole claim of corporate negligence against Appellant, as well as the question of causal negligence. *Id.* at 2.

At trial, Macosky called Leo Lunney, Appellant's Director of Cardiology Services, to testify as if on cross-examination. Lunney testified to the following: in December of 2014, Appellant had specific protocols for performing stress EKGs and evaluating "cardiac ability," and when a protocol is not followed, the hospital must enforce it. N.T. Trial, 2/26/18-3/6/18, at 73-74, 78.[3] Consistent with protocol, a cardiologist must interpret the EKG images and create a report; the hospital must send the report to the patient's "family physician or whoever ordered the study"; the report must be "complete"; and the hospital could not send a report that was not signed by a physician. *Id.* at 78-79. Pursuant to Appellant's "internal policy," if an EKG

---

[3] For ease of discussion, in future citations we cite the trial transcript with the February 26, 2018 date only.

report was not signed by the physician or recorded within 72 hours of the test, the report would be "flagged," and if a sonographer determined that the report was not signed, the sonographer's department would request the cardiologist to "interpret the study so that we could send it out." *Id.* at 79. Lunney testified that Appellant — not Dr. Udoshi — bore the responsibility of sending Macosky's complete EKG report to his family physician. *Id.* at 78.

Lunney further explained that there were three methods for reporting the results of an EKG: (1) the physician dictates his observations, which are later transcribed into the report; (2) the physician enters text directly into a "structured report that resides in the stress system"; or (3) the data is sent to a report "in the PACS system," which a physician accesses to enter his interpretation. N.T. Trial, 2/26/18, at 80-81.

Lunney testified that with respect to Macosky's 2014 EKG, Dr. Udoshi reported under the first method; he "interpreted the images live on the echo machine in the room while [Macosky] was there . . . and wrote his findings on the stress machine." N.T. Trial, 2/26/18, at 82-83. Macosky introduced the 2-page report that was generated from this interpretation, "entitled the Bruce Stress Test Report"; the report did **not** indicate Macosky's ejection fraction — a point which Lunney acknowledged. *Id.* at 85. The report instead stated Dr. Udoshi's observation: "Heart rate responses suggestive of poor physical conditioning. Normal wall thickening and wall motion with stress echo." Bruce Stress Test Report, Macosky Trial Exhibit 1. The report was signed

electronically by Dr. Udoshi on the same day the EKG was conducted. Lunney stated that it was "probably" faxed to Macosky's primary care physician that day. *Id.* at 83.

Lunney further testified that the third method of reporting was not necessary. Dr. Udoshi "didn't need to go back to the PACS machine and look at stored images to do the interpretation" because he had already recorded his findings on the stress machine. N.T. Trial, 2/26/18, at at 83. Nevertheless, the testing machine still sent the data to "the structured report in the PACS system." *Id.* at 81. Lunney stated that this "structured report" was "moot" and "useless," because Dr. Udoshi had already "interpreted the images live." *Id.* at 82-83. Lunney explained that his department would receive an alert that "this [was] an outstanding report because it wasn't signed," and a staff member would access the record, confirm a full report already existed, and "sign off on this report so that it would be out of the queue and off of the list as outstanding." *Id.* Macosky offered into evidence the 1-page report, entitled "Exercise Stress Echocardiogram Report" (Stress EKG Report). This document did report Macosky's ejection fraction, which was 45.6. Finally, this document was electronically signed by "Echocardiography Department" on January 16, 2014, seven days after the EKG.

Macosky called Linda Makowski, Appellant's Director of Health Information Management, to testify about the "audit trail" for the Stress EKG Report. Makowski stated that the "audit trail" showed that the report was

accessed: (1) on January 9, 2014, the day of the EKG; (2) twice the following day, January 10th, including once for billing purposes; (3) on January 14th, five days after the EKG, by Colita Barber-Ramos, who would have checked whether the report was signed by a physician; (4) on January 16th, seven days after the EKG, at 1:56 p.m. and 1:59 p.m. by Margaret Rasmus; (5) two minutes later, at 2:01 p.m. by Margaret Wayman; and (6) finally, thirteen minutes later at 2:15 p.m. by Marcy Hanlon. N.T. Trial, 2/26/18, at 157-163. Nine minutes later, the report was signed electronically by the "Echocardiography Department." *Id.* at 165. Makowski could not say who entered that signature. *Id.*

Maocsky also read the deposition of Margaret Rasmus into the record. Rasmus, Appellant's sonographer, conducted part of Macosky's EKG, and at the deposition, stated that she measured the ejection fraction for Macosky's left ventricle as 45.6%. N.T. Trial, 2/26/18, at 177. Rasmus stated that this figure was not in the "normal" range of 55 to 60%; Rasmus explained that aside from entering this figure into the report, she did not notify the physician. *Id.* at 178.

Next, Macosky called Michael Remetz, M.D., to testify as an expert in internal medicine and cardiology. Dr. Remetz testified that the left ventricular ejection fraction is "the percentage of blood that is ejected from the heart with each beat" and is "considered the most important aspect of cardiac performance." N.T. Trial, 2/26/18, at 125. Dr. Remetz opined that a "normal"

ejection fraction is 60-65%, and that the lack of follow-up care for Macosky could have allowed his condition to worsen. *Id.* at 135-36. With respect to Macosky's 2016 EKG showing a 10% ejection fraction, Dr. Remetz stated: "[T]he heart with each ejection is barely moving. . . . [T]hat's as low as you could see essentially without being — passing on. This is an imminently life-threatening number." *Id.* at 137. Finally, Dr. Remetz opined, within a reasonable degree of medical certainty, that a physician's failure to evaluate ejection fraction, a cardiologist's failure to communicate an EKG report to a "patient or the ordering physician," and a cardiologist's failure to sign an EKG report all fall below the standard of care. *Id.* at 127-128, 134.

Following Macosky's presentation of his case, Appellant moved for a directed verdict or compulsory nonsuit, arguing that Macosky failed to present expert testimony that Appellant deviated from the standard of care or that the deviation was a substantial factor in causing harm.[4] N.T., 2/26/18, at 477-478. The trial court denied the motion.

Relevant to Appellant's issues, we note that over Appellant's objection, the trial court allowed Macosky to introduce evidence of his future medical expenses, including the cost of a left ventricular assistive device (LVAD) and a heart transplant. Conversely, the court did not allow Appellant to introduce evidence of Macosky's history of alcohol consumption. Further, the court gave

---

[4] Appellant had previously advanced the same argument in a motion for partial summary judgment, which the trial court denied. *See* Order, 2/9/18.

the following jury instruction, over Appellant's objection: "It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients." N.T. Trial, 2/26/18, at 605, 636.

On March 6, 2018, the jury announced its verdict, finding that both Appellant's and Dr. Udoshi's conduct fell below the applicable standard of medical care, and their negligence was a factual cause of harm to Macosky. N.T. Trial, 2/26/18, at 729. The jury attributed 80% of the causal negligence to Dr. Udoshi and 20% to Appellant, and awarded total judgment of $3,364,017.40.[5] *Id.* at 730-731.

Appellant filed a timely motion for a new trial and for judgment notwithstanding the verdict (JNOV), again arguing, *inter alia*, that Macosky failed to produce any expert opinion relevant to corporate liability, or even critical of Appellant. The trial court denied the motion on September 5, 2018. On September 13th, the court granted Macosky's motion to mold the verdict to add pre-judgment interest, and judgment was entered that same day in

---

[5] This sum consists of $2,432,052 for future medical and related expenses for the year 2018; $85,776 future medical and related expenses for the year 2026 (the jury awarded $0 for the years 2019 through 2025, and 2027 through 2046); $80,000 for past loss of earnings; $41,111 for past physical pain, mental anguish, discomfort and distress; $88,806.40 for past medical expenses; $429,000 for future loss of earnings; and $207,272 for future physical pain, mental anguish, discomfort and distress. The jury awarded $0 to Sharon Macosky for loss of consortium.

the amount of $3,530,536.26.[6]

Appellant filed a timely notice of appeal. The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, but issued an opinion on December 11, 2018.

Appellant presents four issues for review:

1. Whether the Trial Court erred in failing to grant Judgment Notwithstanding the Verdict on [Macosky's] corporate negligence claim, where [Macosky] failed to present competent expert testimony required to support this claim, and therefore, as a result, the corporate negligence claim failed as a matter of law?

2. Whether the Trial Court committed an error of law in improperly instructing the jury concerning the doctrine of hospital corporate liability, which directly impacted the outcome of the case?

3. Whether the Trial Court abused its discretion in permitting the jury to hear evidence of future medical expenses, including LVAD (left ventricular assistive device) and heart transplant, costing in excess of $2 million, in the absence of any expert medical testimony, to any degree of certainty, that such treatment would be required and necessary for [Macosky] in the future?

4. Whether the Trial Court abused its discretion in not allowing the jury to hear relevant evidence concerning [Macosky's] alcohol consumption, where the medical records demonstrated that alcohol consumption caused [Macosky's] condition, thereby preventing [Appellant] from establishing [Macosky's] comparative negligence?

Appellant's Brief at 6-7.

In its first issue, Appellant avers that "[i]n all but the rarest" corporate negligence cases, a plaintiff must present an expert witness to establish that

---

[6] Of this amount, $85,776.00 is "a future periodic payment that is not payable until January 1, 2026." Order, 9/13/18, at 1.

a hospital deviated from the standard of care and that the deviation was a substantial factor in causing harm. Appellant's Brief at 23. Appellant argues that although Macosky's expert witnesses criticized Dr. Udoshi's conduct, there was no expert opinion that Appellant was liable for the incomplete or incorrect interpretation of Macosky's EKG results. Appellant distinguishes this case from ***Cangemi v. Cone***, 774 A.2d 1262 (Pa. Super. 2001), in which this Court held that expert testimony was not necessary where a hospital failed to send an x-ray report to the attending physician. ***Id.*** at 34. Appellant points out that here, the Bruce Stress Test Report was sent to Macosky's family physician, and "[t]he interplay between [a physician's] discretion . . . in deciding what information to include in his interpretation versus [Appellant's] duty to have policies and procedures to mandate what information is included . . . is a concept requiring expert analysis and opinion, and is beyond the experience of a lay jury." ***Id.*** at 35. On this basis, Appellant concludes that the trial court erred in denying its motion for JNOV.[7] We disagree.

It is well settled that:

Our standard of review of an order denying judgment n.o.v. is

_____

[7] Appellant also argues that the trial court erred in denying its motion for nonsuit. Appellant's Brief at 24. However, because Appellant presented evidence, the court's ruling is moot, and we thus consider only Appellant's JNOV claim. ***See F. W. Wise Gas Co. v. Beech C. R. Co.***, 263 A.2d 313, 315 (Pa. 1970) ("[T]he refusal of a motion for nonsuit is not a valid reason for a new trial in this or any case where the defendant offers testimony. A defendant's right to request a nonsuit is based on his offering no evidence, and the court cannot grant a nonsuit after the introduction of evidence by the defendant.").

whether, reading the record in the light most favorable to the verdict winner and granting the benefit of every favorable inference, there is sufficient competent evidence to support the verdict. Any conflict in the evidence must be resolved in the verdict winners' favor. Judgment n.o.v. may be granted only in clear cases where the facts are such that no two reasonable minds could fail to agree that the verdict was improper.

*James v. Albert Einstein Med. Ctr.*, 170 A.3d 1156, 1165 (Pa. Super. 2017) (citation omitted).

The Pennsylvania Supreme Court has "adopt[ed] as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patient." *Thompson v. Nason Hosp.*, 591 A.2d 703, 708 (Pa. 1991). The Court explained:

Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients[.]

*Id.* at 707 (citations omitted).

[I]t is necessary to show that the hospital had actual or constructive knowledge of the defect or procedures which created the harm. Furthermore, the hospital's negligence must have been a substantial factor in bringing about the harm to the injured

party.

*Id.* at 708 (citations omitted).

Further, our Supreme Court has addressed the evidence necessary to prove corporate liability:

> In a traditional medical malpractice action, where the defendant's negligence is not obvious, a plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered. . . . [W]e hold that, unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff.

*Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997) (citations omitted).

Instantly, the trial court applied the decision in *Cangemi*, 774 A.2d 1262, which, as stated above, Appellant argues is distinguishable. In *Cangemi*, the patient was admitted to the hospital, and x-rays were taken. *Id.* at 1264. The x-ray results showed the patient had an abdominal aortic aneurysm, but the results were not conveyed to the treating physician (who was also the patient's family physician), and the patient's aneurysm was not diagnosed. *Id.* at 1264. Two months later, the patient died from complications associated with the aneurysm. *Id.* at 1265. The patient's estate sued the physicians and hospital for corporate liability for failure to diagnose the aneurysm. *Id.* at 1264.

On appeal, this Court held that the plaintiff was not required to present expert testimony regarding the hospital's negligence:

"[T]he duty to formulate and adopt adequate rules and policies surrounding the delivery of x-rays and radiologist's reports are not beyond that of the average lay person." . . . We conclude expert testimony is not necessary in this case because the issue is simple and the want of care is so obvious; when the hospital's radiologist has a report that suggests [the patient] has an abdominal aneurysm and the attending physician does not get the report, it is either because of the negligence of the hospital or the negligence of the physician. [The patient's] expert opined that had [his family physician] received this report, he would have made a proper timely diagnosis and realized [the patient] was suffering from a leaking aneurysm. By alleging that he never received the report, [the family physician] in effect is pointing the finger at the hospital for failing to make the report available. Accordingly, it is a factual dispute appropriately left for the jury to resolve. [The patient's] expert established a causal connection between the missing report and the failure to diagnose. The question left for the jury should have been whether [the family physician] did not get the report because of the hospital's negligence in failing to follow its policies and procedures or whether it was his fault he did not get the report due to his own negligence in not seeking it out.

*Cangemi*, 774 A.2d at 1266-1267 (citation omitted).

Here, the trial court found the facts to be analogous to *Cangemi*. The

court reasoned:

A review of the record in this matter, and in particular the Trial Transcript . . . , convinces this Court that this is a case which fits squarely into the exception to the general rule requiring expert testimony to establish a *prima facie* case of corporate negligence against a hospital. This was not a case where [Macosky] needed an expert to testify that the hospital should have had some specific policies and/or protocols in place with respect to the interpreting, signing and transmission of echocardiogram studies like those performed on . . . Macosky. Rather, the testimony of [Appellant's] own Director of Cardiology Services, Leo Lunney, established that the hospital already had such policies and protocols in place, and there was ample testimony upon which a lay jury could conclude that the hospital obviously failed "to oversee all persons who practice within its walls as to patient care" and/or failed to enforce its own "rules and policies to ensure

- 13 -

quality care for patients." [N.T., 2/26/18, at 71-114.] In fact, the Court is of the opinion that this is an even clearer case where expert testimony was not required than ***Cangemi***[,] because, unlike the situation in ***Cangemi*** where it was unclear who was responsible for transmitting the x-ray report involved in that case, Mr. Lunney acknowledged on the stand that "distribution of the [echocardiogram] report [to the ordering physician] is the responsibility of the hospital." [N.T., 2/26/18, at 77.] Similarly, the testimony of Linda Makowski, [Appellant's] Director of Health Information Management, provided a basis upon which the jury could have easily concluded that not only did the hospital fail to follow its own policies and protocols, it had constructive notice of its failure by virtue of the audit trail of the study done on [Macosky,] which was never signed by Dr. Udoshi as per hospital protocol, but instead was ultimately signed as the "Echocardiography Department," presumably to keep it from continuing to pop up in the hospital's system as an unsigned report. [***Id.*** at 153-169.] The testimony of Margaret Rasmus, who was the cardiac sonographer at [the hospital] who performed the echocardiogram on Mr. Macosky, was likewise unhelpful to the hospital in terms of failing to follow its own policies and being on notice of that fact. [***Id.*** at 170-184.]

Trial Court Opinion, 12/11/18, at 3-4.

We are not persuaded by Appellant's insistence that this case presents the complex issue of "[t]he interplay" between a physician's discretion "in deciding what information to include in" a report and a hospital's duty to regulate what information is included in a report. ***See*** Appellant's Brief at 34-35. Appellant overlooks the trial testimony, given by its own employee, that Appellant had procedures for ensuring that the appropriate physician timely completed an EKG report; Appellant, and not a cardiologist, was responsible for sending an EKG report to the appropriate physician; and if these procedures were not followed, it was Appellant's responsibility to enforce them. ***See*** N.T., 2/26/18, at 73-74, 78-79 (testimony of Lunney). We agree

with the trial court that this case falls within the purview of **Cangemi**. **See Cangemi**, 774 A.2d at 1266; **Welsh**, 698 A.2d at 585. Thus, we thus do not disturb the trial court's denial of JNOV on this issue.

In its second issue, Appellant challenges the trial court's instruction to the jury: "[I]t is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients."[8] Appellant's Brief at 37, *quoting* N.T., 2/26/18, at 636. Appellant states, "[h]ere, an outpatient stress [EKG] happened to take place at [Appellant hospital] and was interpreted by a single physician." *Id.* at 38. Thus, Appellant asserts that the instruction was "materially incorrect and misleading by taking a case that, at most, sounds in vicarious liability for the alleged negligence of a physician, *i.e.*, Dr. Udoshi, and elevates it to the level of systemic negligence contemplated by case law interpreting the doctrine of hospital corporate negligence." *Id.* We are not persuaded.

Preliminarily, we note:

> We review the trial court's jury instructions for an abuse of discretion or legal error controlling the outcome of the case. A jury charge will be found to be adequate unless, when read in its entirety, the charge confused the jury, misled the jury, or contained an omission tantamount to fundamental error. "[I]t must appear that the erroneous instruction may have affected the jury's verdict." Consequently, the trial court has great discretion in forming jury instructions.

---

[8] Appellant objected to this instruction, and the trial court overruled. N.T., 2/26/18, at 605. Accordingly, Appellant has preserved this issue for appeal. **See Meyer v. Union R.R. Co.**, 865 A.2d 857, 861 (Pa. Super. 2004).

*Meyer*, 865 A.2d at 862 (citations omitted).

Here, the trial court's jury instruction was identical to the instruction in *Rauch v. Mike-Mayer*, 783 A.2d 815 (Pa. Super. 2001), where the plaintiff likewise presented a claim of corporate liability against a hospital, and the trial court instructed: "It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients." *See id.* at 820, 828; N.T., 2/26/18, at 636. This Court explained:

> If the attending physician fails to act in accordance with standard medical practice, it is incumbent upon the hospital staff to so advise hospital authorities in order that appropriate action might be taken. A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. Furthermore, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

*Rauch*, 783 A.2d at 828 (citation omitted).

Appellant's argument — that "at most, [this case] sounds in vicarious liability for the alleged negligence of" Dr. Udoshi — ignores Macosky's theory of the case, as well as the supporting evidence, that Appellant failed to enforce its own procedures for the proper completion and reporting of EKG results. The trial court agreed to give the above instruction on the basis of Margaret Rasmus' testimony. *See* N.T., 2/26/18, at 609. As discussed above, Rasmus testified that she measured Macosky's left ventricle ejection fraction as 45.6%, which she believed was less than the normal range of 55 to 60%, but she did

not notify the physician aside from entering the information into the Stress EKG Report. *Id.* at 177. In light of this evidence, and incorporating our discussion of Appellant's first issue, we conclude the trial court did not abuse its discretion in instructing the jury that under Pennsylvania law, a hospital has a duty to report abnormalities in a patient's condition. *See Meyer*, 865 A.2d at 862; *Rauch*, 783 A.2d at 828. Furthermore, where the court's entire jury charge spanned 24 pages and approximately 50 minutes in duration,[9] we disagree with Appellant's claim that this particular instruction confused or misled the jury. *See Meyer*, 865 A.2d at 862; N.T. Trial, 2/26/18, at 619-642. Accordingly, no relief is due.

In its third issue, Appellant avers that the trial court erred in admitting Macosky's evidence of future medical expenses, including expenses for an LVAD and heart transplant. Macosky presented evidence that the average cost of an LVAD was $732,302 and the average cost of a heart transplant was $1,834,034. N.T., 2/26/18, at 335. Appellant contends that there was no "expert medical testimony to any degree of certainty that such treatment would be required."[10] Appellant's Brief at 40. In support, Appellant cites the testimony of Macosky's expert, Allan Gass, M.D., who responded affirmatively

---

[9] The trial transcript indicates that the jury entered the courtroom for jury instructions at 11:50 a.m., and the jury left the courtroom to deliberate at 12:40 p.m. N.T., 2/26/18, at 619, 642.

[10] Appellant filed a pre-trial motion *in limine* to preclude this evidence, and thus has preserved this issue for appeal.

to the questions, "[I]s it fair to say that at this stage you cannot say with any type of reasonable certainty whether [Macosky] will definitely need the heart transplant[?,]" and "[W]ithout [a] crystal ball, we don't know where Mr. Macosky is going?" Appellant's Brief at 41, *quoting* N.T., 2/26/18, at 244. Appellant concludes that the admission of the future expenses evidence was an abuse of discretion and fundamentally impacted the outcome of the case, and therefore a new trial is warranted.

It is well settled that decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court, and this Court may reverse only if we find an abuse of discretion or error of law. **Smith v. Paoli Mem'l Hosp.**, 885 A.2d 1012, 1016 (Pa. Super. 2005) (citations omitted). Here, the trial court allowed Macosky's evidence under the "relaxed standard" for increased-risk-of-harm, citing, *inter alia*, our Supreme Court's decision in **Mitzelfelt v. Kamrin**, 584 A.2d 888 (Pa. 1990). Trial Court Opinion, 12/11/18, at 6. We consider that decision in detail.

**Mitzelfelt** presented a question of whether the plaintiff presented evidence that the acts of the defendant hospital increased the plaintiff's risk of harm.[11] **Mitzelfelt**, 584 A.2d at 892. At trial, the plaintiff's expert witness

---

[11] The plaintiff in **Mitzelfelt** alleged that during surgery, her blood pressure dropped, the surgeons and anesthesiologist failed to treat it, and their negligence caused her subsequent paralysis. **Mitzelfelt**, 584 A.2d at 890. The case proceeded to trial on the plaintiff's claims of liability against the hospital.

testified:

> [Plaintiff's counsel:]  The bottom line is, do you know within a reasonable degree of medical certainty . . . that this drop in [blood pressure during surgery to] between 85 and 90 millimeters of mercury caused the problem that [the plaintiff suffered?]
>
> [Expert witness:]  No. It is my opinion that it could have, but I wouldn't put it as a reasonable degree of medical certainty.

*Id.* at 891.  The hospital claimed that a directed verdict was warranted because the plaintiff's expert "was unable to state, with a reasonable degree of medical certainty, that the plaintiff's injuries were caused by the negligence of the [hospital's] anesthesiologist." *Id.* at 892.

On review, the *Mitzelfelt* Court disagreed.  It reasoned that generally:

> A plaintiff is . . . required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.  In many cases, this is not a problem for a plaintiff.  However, certain cases make this an impossible standard.  These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm.
>
> An example of this type of case is a failure of a physician to timely diagnose breast cancer.  Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease.  This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit.  Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm.

*Mitzelfelt*, 584 A.2d at 892.

The Supreme Court thus applied the "relaxed standard" for a plaintiff's burden of proof in an increased-risk-of-harm case:

[W]e employ a two part test. The first step is to determine whether the expert witness for the [plaintiff] could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the [plaintiff] suffered. . . .

The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard. As the experts all testified, twenty percent of patients do poorly after [the surgery that the plaintiff underwent]. As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the condition from which [the plaintiff] suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it could have caused the harm. Once [the plaintiff's expert] rendered this opinion, it then became a question for the jury whether they believed it caused the harm in this case.

*Mitzelfelt*, 584 A.2d at 894.

In this case, Macosky's expert, Dr. Gass, testified that there are four recognized stages of heart failure: A, B, C, and D. N.T., 2/26/18, at 219. When Macosky underwent the first EKG in January of 2014, he had Stage B heart failure; a Stage B patient would generally have a weakened heart muscle but would not have symptoms. *Id.* at 232-233. At the time of Macosky's second EKG in 2016, and at the time of trial, Macosky's condition had worsened to Stage C, and he would take heart medication for life. *Id.* at 233, 235. Dr. Gass opined within a reasonable degree of medical certainty that had Macosky started appropriate medication therapy in 2014, there was a "chance" that he would not need his current medicine and that he could have

returned to his normal employment. *Id.* at 235-236. However, "[t]he lack of treatment for two years" eliminated these chances for Macosky. *Id.* at 237. This testimony tended to show, consistent with *Mitzelfelt*, that within a reasonable degree of medical certainty, Appellant's acts or omissions **could** have caused the type of harm suffered by Macosky — worsened heart failure. *See Mitzelfelt*, 584 A.2d at 894.

Next, Dr. Gass explained that there were no further medications available to a Stage C patient, that only "time" separated Stages C and D, and a Stage D patient would be "on maximum therapy" and need a heart transplant or heart pump. *Id.* at 218, 227, 234. If Macosky experienced more heart failure symptoms, "he would need to be evaluated for a heart transplant or heart pump." *Id.* at 227. Dr. Gass testified — immediately prior to the testimony cited by Appellant on appeal — about an exhibit showing "the trajectory of a classic heart failure patient":

> [W]hen patients present, they present with symptoms and that's the first decline, and then with medical therapy and lifestyle changes they get better, and then they plateau, and then they get worse, and then they plateau, and then they get worse; but overall the trajectory is down and most heart failure patients eventually will deteriorate but the plateaus or the stable time periods is unpredictable, but usually this is the trajectory of a classic heart failure patient.

N.T., 2/26/18, at 244. It was following this statement that Dr. Gass responded that he could not, with "reasonable certainty," say whether Macosky would "definitely need [a] heart transplant." *Id.* at 243.

In light of Dr. Gass's extensive testimony and the discussion in

*Mitzelfelt*, we conclude that the trial court did not abuse its discretion in allowing evidence about the average costs of an LVAD and a heart transplant. Dr. Gass's testimony is analogous to that of the expert in *Mitzelfelt* — where the expert testified that he could not say for certain that a drop in blood pressure precipitated the plaintiff's injury. *See Mitzelfelt*, 584 A.2d at 891. Nevertheless, under the relaxed standard, because there was testimony about Appellant's failure to timely detect Macosky's lower ejection fraction, and such failure increased the risk that Macosky would suffer harm, it was a question for the jury whether, by a preponderance of the evidence, Appellant's acts or omissions were a substantial factor in bringing about the harm. *See id.* at 892. Accordingly, the trial court properly allowed the evidence of future medical expenses.

In its final issue, Appellant avers that the trial court erred in excluding evidence of Macosky's history of alcohol consumption. Appellant maintains that Macosky's non-party physician, Susan Brozena, M.D., noted that Macosky had "heavy alcohol intake" for years, and this long-term alcohol use should be considered when addressing his health issues. Appellant's Brief at 46. Appellant adds that "Dr. Brozena strongly favored an alcohol-related etiology for [his] cardiomyopathy." *Id.* at 46. Appellant contends that Macosky's alcohol consumption was thus "invariably intertwined with and referenced throughout Mr. Macosky's underlying medical treatment record." *Id* at 46-47.

The trial court excluded this evidence, reasoning that where Macosky's claims were predicated on misdiagnosis and an increased risk of harm, the cause of Macosky's underlying heart condition was not relevant. Trial Court Opinion, 12/11/18, at 5. The court further "determined that any probative value of such evidence would be greatly outweighed by its prejudicial effect." *Id.* at 5-6. We agree.

It is undisputed that in 2014, Macosky's first EKG results already showed a low ejection fraction, indicating heart failure. Macosky's claims of negligence went to the defendants' misinterpreting or misreporting this condition. The question of why or how Macosky came to have heart issues was not relevant to whether Appellant had a duty of care to properly report the EKG results, breached this duty, or had actual or constructive knowledge of the defect or procedures which created Macosky's harm. *See Thompson*, 591 A.2d at 707-708. Accordingly, we do not disturb the trial court's evidentiary ruling.

For the foregoing reasons, we affirm the judgment entered in favor of Macosky.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/2019

- 23 -